Filed 6/28/13  In re E.W. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.W., a Person Coming Under the Juvenile Court Law. | |
| SAN MATEO COUNTY HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>C.T. and M.W.,<br><br>        Defendants and Appellants. | A135812<br><br>(San Mateo County Super. Ct. No. 81955) |

C.T. [Mother] and M.W. [Father] challenge a dispositional order placing their baby, E., in a foster home for medically fragile infants.  Mother contends the order is not supported by substantial evidence and that the court failed to make certain findings required when a child is removed from parental custody.  Father contends his constitutional right to confront witnesses was violated when the court allowed the ICWA expert to testify by phone rather than in person.  The order placing E. in foster care was supported by substantial evidence.  Although the court did not make the findings required for the dispositional order, we conclude its failure to do so was harmless.  Father's right to confront witnesses was not violated.  Thus, we affirm.

1

## OVERVIEW

Some of the relevant background is addressed in our prior opinion, *C.T. and M.W. v. Superior Court* (June __, 2013, A131823), in which we denied both parents' petitions to vacate an order setting a permanent placement hearing under Welfare and Institutions Code section 366.26 and which we incorporate here by reference.[1]  For clarity and to avoid repetition, we will discuss additional background only as necessary to address parents' specific appellate contentions below.

## DISCUSSION

### I. Mother's Appeal

Mother contends that the evidence does not support the dispositional order placing E. in foster care.  We disagree.  The evidence of E.'s needs and Mother's inability to safely care for him solidly supports the dependency court's order.

Under section 361, subdivision (c)(1), "[a] dependent child may not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence of any of the following. . .: [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents' or guardians' physical custody."  An order directing removal of a minor under section 361 "is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.]  The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child." (*In re Diamond H*. (2000) 82 Cal.App.4th 1127, 1136, overruled on another point in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.)

---

[1] Unless otherwise noted, references to California statutes are to the Welfare and Institutions Code.

When we assess the evidence supporting a child's removal from parental custody, we review the record in the light most favorable to the juvenile court's ruling to determine whether there is substantial evidence from which a reasonable trier of fact could make the required findings. (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 694; *In re Henry V.* (2004) 119 Cal.App.4th 522, 529.) Our task is therefore to determine "whether evidence that is of reasonable, credible and solid value supports the dependency court's findings." (*In re E.H.* (2003) 108 Cal.App.4th 659, 669; *In re Angelia P.* (1981) 28 Cal.3d 908, 924.)

It does. E. was born prematurely on December 3, 2011, and was immediately detained in a foster home for medically fragile infants when he was released from the hospital on January 2, 2012. The combined jurisdictional and dispositional hearing initially set for January 25, 2012 was held on May 24th and June 14th and 15th. The San Mateo County Human Services Agency (the Agency) filed a social study report and four addenda that were considered at the hearing. The reports and witness testimony discussed below provide sufficient evidence of both E.'s particular vulnerability and Mother's limitations as a caretaker to clearly demonstrate that placing him in her care would create a serious risk of harm that could not reasonably be avoided if he were not removed from her care.

### 1. E.

Following his premature birth and 36 days in the newborn nursery, E. was monitored at the Lucile Packard Children's Hospital clinic for high risk infants. Neither parent attended his first clinic appointment on May 23, although both said they would. E.'s tone was abnormally poor and he displayed deficiencies in strength, motor skills, trunk control, and eye contact. Doctors were concerned about his developmental delays and recommended a further assessment at Golden Gate Regional Center (the Regional Center), physical therapy, and follow-up at Packard. In late May the Regional Center assessment resulted in E.'s referral for further evaluation of his delays in communication and basic development.

3

E. started weekly physical therapy in early June. He underwent a neurological assessment in April. E. was " 'doing very well, but given the family history and his initial course, it [was] considered the best course to catch any deficits he . . . [had] earlier than later, in order to intervene with therapies.' " The neurologist recommended another neurological assessment when E. was six to eight months old.

When he was six months old, E. was still living in the foster home for medically fragile infants. His skull was "remarkably" flattened and his face was lopsided as a result, so he was fitted for a corrective helmet he would need to wear for three to six months. He would have to be seen every two weeks during the rehabilitation for monitoring and adjustments to the helmet. E.'s foster mother, who has many years of experience caring for medically fragile infants, was concerned about E.'s unusually loud, piercing, screaming cry that continued for hours at a time.

Due to the foster mother's experience with medically fragile infants, Dr. Rosenbaum, E.'s primary pediatrician, was " 'extremely comfortable' " with E.'s placement. He was very concerned about E. being released to any kind of " 'chaotic' " environment, and specifically expressed concern about the chaotic manner in which the parents presented at an appointment in April.

### *2. Mother*

As noted in our prior opinion in this case, Mother is developmentally delayed with a history of drug and alcohol abuse and diagnoses of personality disorder with volatile explosive behavior pattern, " 'major depressive disorder vs. mood disorder not otherwise specified,' " impulsive control disorder, borderline personality, mild mental retardation, and diabetes. (*C.T. and M.W. v. Superior Court*, *supra*, at p. 2.) There is ample evidence in the record that these challenges prevent Mother from providing E. with a safe and stable home.

The Agency's reports for the jurisdiction/disposition hearing reflect the concerns expressed by numerous care providers that E. would not be safe in Mother's care. Of particular concern was Mother's often aggressive behavior and lack of impulse control. Psychiatrist Lynne Haynes-Tucker assessed Mother's medications. She observed:

" 'From [Mother's] history, she has these episodes of getting upset, cutting herself, and smashing furniture. Medications aren't going to predict whether or not she's going to have those episodes. Every time she came into PES there was a medication list, and she was usually on mood stabilizers or antidepressants. If those really helped, I would have expected her to decompensate a lot while off the medication, but that didn't really happen. For the past couple of years, it seems like she's been doing the best she's capable of. I'm not sure meds are the answer. The real concern is about her being labile as a parent. The consensus among the treating psychiatrists was that the problem is not a mood disorder, but rather, poor insight and impulse control, which is common for folks with mental retardation. The big problem is her anger control. It doesn't seem like there would be a cocktail of medication that would help her.' "

Dr. Haynes-Tucker opined that " 'the problem is that [Mother's] history is this explosive disorder, and even if she does everything right for four months, she could have an explosive episode at any time. I think she's lower in the mentally retarded range, where she's not able to control her impulses. There are many opinions in the records that this is more of an underlying problem, where she has difficulty regulating mood and responses to small triggers.' " Consequently, Dr. Haynes-Tucker was " 'concerned about [Mother] being able to control her impulses if she were upset around the baby. I don't think she can be a stable parent.' "

Others shared this concern. Mother has a history of behaving violently toward her service providers. She became "hysterical" with parenting teacher Anabel Zepeda during a visit with E. on March 22, shouting and cursing at her. Mother told social worker Katherine Odle, who was also present, that Zepeda lied to Odle about previous visits and "ha[d] an attitude with me." Therapist Stephanie Coate reported in May that "[t]here's definitely a lot of work that needs to be done" in regard to Mother's impulse control, although her ability to regulate her emotions during her therapy sessions had improved.

Odle testified that Mother was still emotionally volatile, "very impulsive," and "struggle[d] to control her emotions," although she had improved to the extent that the police had not been called and Mother had not been hospitalized during the dependency

5

proceedings. Odle described three incidents between February and May in which Mother became angry and engaged in loud verbal altercations with Father or her service providers, once when E. was "right there." Odle recommended continued out-of-home placement.

Despite repeated guidance and services, Mother tended to handle E. roughly and had a hard time understanding that he could not support his head on his own. She seemed unable to retain information from visit to visit, and consistently needed reminders about the same basic baby care. During many visits she failed to engage or interact with E., despite prompting. Both public health nurse Polly Gloudemans and Zepeda "have observed that we must watch [Mother] very closely or the child may be unsafe."

By June 14, when the Agency filed its final addendum report, the case worker remained concerned about Mother's need for constant instruction on interacting with E. safely and appropriately. She believed that there was still much to do to ensure that the parents could safely meet his needs. Six months had passed since detention and multiple services had been provided in that time, but the Agency "ha[d] the same concerns about the parents [then] that the Agency had at the time of the baby's detention." Lew Tremaine, supervisor with Apple Family Works, was somewhat more optimistic. He felt that Mother was making progress, but he was "certainly not ready to say, 'Oh, she'll be fine with the baby!'"

Lynette Mose, an ICWA social worker with Navajo Children and Family Services, testified that Mother did not engage appropriately with E. during a home visit Mose observed in May. Based on her observations, review of the case reports and other documentation, and the testimony at the combined hearing, Mose testified on June 15th that returning the baby to his parents' care was likely to cause serious emotional or physical damage. She recommended that E. remain in his current placement until his medically fragile status was cleared and then move to an ICWA-compliant foster home, if one was available, or otherwise to a non-ICWA foster home.

6

## 3.  *Analysis*

The dispositional order is supported by the evidence.  While Mother had made some amount of progress, on this record we do not question the juvenile court's determinations that she was incapable of safely caring for the baby, that E. would be endangered in her care, and that there were no reasonable means of keeping him safe short of removal.

Mother argues, correctly, that the court failed to state the findings required under section 361, subdivision (c)(1), that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents . . . ."  The Agency's proposed findings for the jurisdictional/dispositional hearing seem to have conflated these required findings with the *additional* and slightly different finding required for Indian children under section 361, subdivision (c)(6), when "continued custody of the child by the parent or an Indian custodian is likely to result in serious emotional or physical damage to the child, and that finding is supported by testimony of a 'qualified expert witness' as described in section 224.6."

Unfortunately, the Agency's proposed findings confused these statutory requirements.  As a result, it appears, the court did not explicitly make the findings required by subdivision (c)(1) that the danger to E. if he remained with Mother was "substantial" and no reasonable means existed to protect him other than removal.  Instead, the court tracked the proposed findings, and stated: "The Court finds by clear and convincing evidence that the welfare of the child requires that custody be assumed by the Court.  Continuance at home would be contrary to the child's welfare.  The child is an Indian child and by clear and convincing evidence continued physical custody by the parents is likely to cause the child serious emotional and physical damage and this finding is supported in part by the testimony of the qualified expert who also joins in this

7

recommendation." The court neglected to state that the danger to E. was "substantial" and that there were no reasonable means to protect him without removal, as section 361, subdivision (c)(1), requires. The written "check the box" order is flawed by the same omissions.

In a different case, on other facts, such an error could lead to significant delays, and the resultant anguish and expense such delays inflict on young children and their families and caretakers. But here, the error is harmless. Mother's bouts of rage and aggression, her roughness with the baby, and her inattentiveness to his needs were concerns throughout the six months of E.'s life. Moreover, the court expressly found that custody with Mother was likely to cause E. "serious emotional and physical damage." It is thus inconceivable that on this record the court would have found the dangers posed by placing E. in his mother's custody, although "serious," were anything less than "substantial," or that any measures were available short of removal to protect the baby from Mother's erratic, volatile and aggressive behavior or her neglectful caretaking. Accordingly, the court's failure to articulate its findings on those points was harmless. (See *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218 [failure to make findings regarding minor's change of custody harmless where it is not reasonably probable the finding would have been in favor of continued parental custody].)

Mother further contends the court erred when it failed to "state the facts on which the decision to remove the child is based" as required by section 361, subdivision (d). Here, we simply disagree. The court stated that "[t]he factual grounds to support the findings requiring the assumption of custody [are] the allegations in this sustained petition as well as the reports and the testimony of the witnesses before the Court." The jurisdictional allegations included that Mother "regularly exhibits oppositional and explosive conduct toward the staff," "engages in altercations with the alleged father . . . when he comes to visit her there," and failed to participate in services offered to address her serious medical, mental health and developmental needs. This abbreviated statement was sufficiently clear to explain the factual basis of the court's decision.

8

Even if it were not, again the purported error was harmless. When the juvenile court fails to state the factual basis for an order, the error is deemed harmless where " 'it is not reasonably probable such finding, if made, would have been in favor of continued parental custody.' " (*In re Jason L., supra,* 222 Cal.App.3d at pp. 1218-1219, quoting *In re Diamond H., supra,* 82 Cal.App.4th at p. 1137.) In view of the evidence and the court's findings, that is the case here.

Mother also asserts that Ms. Mose's testimony did not satisfy the requirement under section 361, subdivision (c)(6), for an expert opinion that custody with the parent is likely to harm the child. She is wrong. Lynette Mose's qualification as an ICWA expert was uncontested, and she testified directly on that point. Mother's further contention that the court failed to consider or "underst[and] the substantive significance of the 'clear and convincing' standard for dispositional removal" is equally unfounded. The removal order specifies that the court's findings were made by clear and convincing evidence and Mother points to nothing in the record to show that the court misunderstood that standard.

## II. Father's Appeal

Father raises essentially one challenge to the dispositional order. He says the juvenile court violated his constitutional rights to confront and cross-examine adverse witnesses when it permitted ICWA expert Lynette Mose to appear by telephone rather than in person. We disagree. The juvenile court properly denied Father's request for Mose to testify in person because his request was untimely, Father's delay in making it was unjustified, and the delay that would have resulted was contrary to E.'s welfare.

"[I]n dependency proceedings, a parent's right to due process is limited by the need to balance the 'interest in regaining custody of the minors against the state's desire to conclude dependency matters expeditiously and . . . exercise broad control over the proceedings . . . .' " (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1176.) Thus, "[w]hile a parent in a juvenile dependency proceeding has a due process right to a meaningful hearing with the opportunity to present evidence [citation], parents in dependency proceedings 'are not entitled to full confrontation and cross-examination.' [Citation.]

9

Due process requires a balance." (*Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1146.)

*In re Malinda S.* (1990) 51 Cal.3d 368 is instructive. The court there concluded that placing the burden on a father to subpoena nontestifying witnesses quoted in a social study did not violate his right to confront witnesses. "[B]alanced against any possible hardship to the parent weighs the state's legitimate interest in providing an expedited proceeding to resolve the child's status without further delay. As the court explained in *In re Mary S.* (1986) 186 Cal.App.3d 414, 418-419 [230 Cal.Rptr. 726], 'Dependency proceedings are civil in nature, designed not to prosecute a parent, but to protect the child. A parent at a dependency hearing cannot assert the Fourth Amendment exclusionary rule, since 'the potential harm to children in allowing them to remain in an unhealthy environment outweighs any deterrent effect which would result from suppressing evidence' unlawfully seized. Nor can the parent seek reversal on the grounds of incompetency of counsel. These decisions recognize the paramount concern is the child's welfare. The same principle applies to the father's claimed violation of his right to confront witnesses . . . .' Requiring the state to call every witness mentioned in the social study, including those witnesses whose testimony is undisputed, would needlessly prolong the jurisdictional hearing." (*Id*. at pp. 384-385; see also *In re Mary S., supra,* 186 Cal.App.3d 414, 419 ["We see no justification for extending the face-to-face component of the confrontation right to dependency hearings where the child's welfare is paramount."]; but see *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1664-1665 [finding right to competent counsel in dependency cases].)

Here, the Agency's second addendum report informed the parties as early as March that Mose preferred to appear by telephone from her base in Arizona. She appeared telephonically on March 26, without objection, at which time the court set the contested jurisdictional and dispositional hearing to begin on May 24. Father's attorney was present and made no objection to Mose's request to appear by telephone at the contested hearing. Instead, when the court asked if there were objections, Father's

counsel said that she would defer her decision until she reviewed Mose's curriculum vitae. The court then left it to the parties to work out how Mose would testify.

As it turned out, Mose attended the hearing on May 24 but did not testify that day. When the hearing reconvened on June 14, she appeared telephonically and explained that her supervisor asked her to testify remotely because she had a conflicting meeting in Santa Fe. No one objected, and counsel proceeded with testimony from Olen Simon and Annabel Zepeda.

When the hearing began again the next afternoon, Father's counsel requested for the first time that Mose appear in person: "Your Honor, after further discussion with my client, and he has indicated to me that he would like Ms. Mose's testimony to be in person. I think it's important for him to, you know, hear and see her demeanor as well as he feels that they have had one short meeting, and he feels it's important for her to be here so they can maybe talk further so he can see her testimony in person." The court noted that they were still adjudicating jurisdiction six months into the case, and "we all knew yesterday that [Mose] would not be here, and you never made a request for her to be here in person this afternoon." The Agency's counsel pointed out that all counsel had agreed Mose could appear by telephone two weeks ago, and E.'s attorney confirmed that they all received an email in the past week or two "letting all of us know that she would be, Ms. Mose would be testifying by phone." Father confirmed that he understood on June 14th that Mose would testify by telephone, but he did not raise it with his attorney then because he "was kind of scared to say something." Several of the attorneys were unavailable in the coming weeks, so postponing Mose's testimony to allow her to travel to California would have caused four to six more weeks of delay.

"[T]he court is indeed constrained in its ability to grant continuances: a continuance may not be contrary to the interests of the minor (§ 352, subd. (a)) and shall be granted only on a showing of good cause and for the period of time proven necessary." (*In re Malinda S., supra,* 51 Cal.3d at p. 384.) Here, requiring Mose to appear in person would have added at least another month to the already significant delays in getting to disposition, Father was represented by able counsel throughout, and he gave no good

11

reason for not making his request sooner.  This record presents no basis to disturb the balance the court reached as between Father's request for in-person testimony and E.'s welfare.


**DISPOSITION**

The orders of the dependency court are affirmed.


_____
Siggins, J.


We concur:


_____
McGuiness, P.J.


_____
Jenkins, J.